**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    **Plaintiff,**<br><br>    **v.**<br><br>**BEAXY DIGITAL, LTD., ARTAK HAMAZASPYAN, WINDY INC., NICHOLAS MURPHY, RANDOLPH BAY ABBOTT, BRAVEROCK INVESTMENTS, LLC, FUTURE DIGITAL MARKETS, INC., WINDY FINANCIAL LLC, FUTURE FINANCIAL LLC, and BRIAN PETERSON,**<br><br>                    **Defendants.** | **Civil Action No. 23-cv-1962**<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC" or "Commission") files this Complaint against Defendants Beaxy Digital, Ltd. ("Beaxy Digital"), Artak Hamazaspyan ("Hamazaspyan"), Windy Inc. ("Windy"), Nicholas Murphy ("Murphy"), Randolph Bay Abbott ("Abbott"), Braverock Investments, LLC ("Braverock Investments"), Future Digital Markets, Inc. ("Future Digital"), Windy Financial LLC ("Windy Financial"), Future Financial LLC ("Future Financial"), and Brian Peterson ("Peterson") and alleges as follows:

## SUMMARY

1.      From approximately May 2018 through June 2019, Beaxy Digital and its founder

Hamazaspyan conducted an unregistered "private sale" of a crypto asset security[1] called BXY, illegally raising over $8 million in proceeds through unregistered offers and sales of these securities to approximately 200 crypto asset investors in the United States and abroad.

2.    Beaxy Digital and Hamazaspyan undertook their offer and sale of BXY, which were offered and sold as investment contracts and therefore as "securities" under the federal securities laws, without registering these offers and sales of BXY with the SEC as required by the federal securities laws.

3.    In the BXY offering materials, which Hamazaspyan approved, Beaxy Digital marketed BXY essentially as a so-called "exchange token" (a crypto asset associated with a crypto asset trading platform). Here, Beaxy Digital described prospective BXY purchasers as "investors" and said that Beaxy Digital would use the proceeds from the offering to develop, market, and operate a crypto asset trading platform (hereinafter "the Beaxy Platform"), and tied the value of BXY to the success of the Beaxy Platform and the efforts of Beaxy Digital's management.

4.    Hamazaspyan's representations about the use of proceeds from this unregistered offering of BXY were false. In reality, during the BXY offering and for three months thereafter, Hamazaspyan misappropriated at least $900,000 of the investment proceeds for his personal use, including gambling.

5.    In October 2019, Murphy and Abbott, who were high-level Beaxy Digital personnel at the time but did not control the Beaxy Platform, discovered Hamazaspyan's

---

[1] As used in this complaint, "crypto asset security" refers to an asset that is issued and/or transferred using distributed ledger or blockchain technology – including, but not limited to, so-called "digital assets," "virtual currencies," "coins," and "tokens" – and that meets the definition of "security" under the federal securities laws. "Security" includes any "investment contract," "security-based swap," or "receipt for" a security.

misappropriation and convinced him to separate from all Beaxy Platform-affiliated entities.

6.     As part of Hamazaspyan's separation, Murphy and Abbot assumed control of the Beaxy Platform and began operating it through Windy, an entity they acquired as part of the same series of transactions.

7.     From October 2019 to the present, Murphy and Abbott acted as control persons of Windy and therefore controlled the Beaxy Platform.

8.     From October 2019 to the present, Windy provided and maintained the Beaxy Platform, which was open to the general public for use 24 hours a day, seven days a week, at the internet address beaxy.com. The Beaxy Platform brought together the orders of multiple buyers and sellers in crypto asset securities, using established, non-discretionary methods. Despite providing the Beaxy Platform as a market place for securities, Windy did not register as a national securities exchange.

9.     Further, from October 2019 to the present, Windy was not registered with the SEC as a broker, even though Windy, among other things, was in the regular business of effecting transactions in crypto asset securities at key points in the distribution chain for these securities, by, among other things, actively soliciting and recruiting investors in these securities, regularly advertising the Beaxy Platform, and receiving transaction-based compensation with respect to these securities.

10.    Additionally, from October 2019 to the present, Windy was not registered with the SEC as a clearing agency, even though Windy, among other things, acted as a custodian of securities by holding crypto asset securities as custodial assets for the Beaxy Platform's customers' benefit in Windy-controlled wallets, where the assets were not segregated by customer and only transferred to customers' control following their instructions to withdraw the

assets from the Beaxy Platform.

11.     In February and September 2020, Murphy and Abbott oversaw the review, removal from trading, and resumption of trading of various crypto assets that were offered and sold as investment contracts and therefore as "securities" under the federal securities laws.

12.     During this process, Murphy and Abbott failed to exclude or prevent trading of crypto asset securities on the Beaxy Platform despite knowing facts demonstrating that the crypto assets were in fact offered and sold as securities.

13.     From approximately 2019 to the present, Braverock Investments, Future Digital, Windy Financial, and Future Financial (collectively, the "Braverock Defendants") provided market making services to Windy and to Dragonchain, Inc. ("Dragonchain"), which was the issuer of the crypto asset DRGN that was offered and sold as a security, to provide liquidity in BXY and DRGN trading on the Beaxy Platform by offering to buy and sell these securities at various prices and quantities, and using trading algorithms to execute market making trading strategies, among other things, in exchange for flat monthly fees from Windy and Dragonchain. The Braverock Defendants also engaged in the regular business of buying and selling BXY and DRGN on various crypto asset trading platforms.

14.     During all relevant times, Peterson owned and controlled the Braverock Defendants, including their trading accounts. Neither Peterson nor the Braverock Defendants were registered with the SEC as dealers in violation of the federal securities laws.

15.     By engaging in the misconduct described here, Defendants violated numerous provisions of the federal securities laws, including the antifraud, securities offering registration, and exchange, broker-dealer, and clearing agency registration provisions as detailed below.

16.     The SEC seeks to enjoin each of the Defendants in this action from future

violations of the federal securities laws, and also seeks disgorgement of their ill-gotten gains, along with prejudgment interest and civil penalties. The SEC also requests that the Court enter (a) against Hamazaspyan an officer and director bar pursuant to Section 20(e) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d)(2), and (b) an injunction prohibiting Beaxy Digital and Hamazaspyan from participating, directly or indirectly, in any securities offering; provided, however, that such injunction shall not prevent Hamazaspyan from purchasing or selling securities other than BXY for his own personal account.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action pursuant to Section 20(b) and (d) of the Securities Act, 15 U.S.C. § 77t(b) and (d), and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa. Defendants, directly and indirectly, have made use of the means or instruments of transportation or communication in, and the means and instruments of interstate commerce or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

18.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Defendants reside or transacted business in this district, and some of the transactions, acts, practices, and courses of business constituting the securities violations alleged herein occurred within this district.

## DEFENDANTS

19.     **Beaxy Digital, Ltd.** ("Beaxy Digital") is a Saint Kitts and Nevis corporation with its former principal place of business in Chicago, Illinois. Beaxy Digital has not registered with

the Commission in any capacity, nor has it ever registered any offering of securities under the Securities Act.

20.     **Artak Hamazaspyan** ("Hamazaspyan"), age 34, formerly of Chicago, Illinois, was the founder, President, and a shareholder of Beaxy Digital and was the sole owner and principal of Windy Blockchain Solutions LLC. A citizen of the Republic of Armenia, Hamazaspyan relocated to Armenia in November 2020. Hamazaspyan has not registered with the Commission in any capacity, nor has he ever registered any offering of securities under the Securities Act.

21.     **Windy Inc.** ("Windy") is a Delaware corporation with its principal place of business in Chicago, Illinois. Windy maintained and provided the Beaxy Platform to the public from October 2019 to the present. Windy has not registered with the Commission in any capacity, nor has it ever registered the Beaxy Platform with the Commission in any capacity.

22.     **Nicholas Murphy** ("Murphy"), age 30, is a resident of Chicago, Illinois. Together with Randolph Bay Abbott, he is co-owner and co-president of Windy. Murphy has not registered with the Commission in any capacity, nor has he ever registered the Beaxy Platform with the Commission in any capacity.

23.     **Randolph Bay Abbott** ("Abbott"), age 30, is a resident of Chicago, Illinois. Together with Murphy, he is co-owner and co-president of Windy. Abbott has not registered with the Commission in any capacity, nor has he ever registered the Beaxy Platform with the Commission in any capacity.

24.     **Brian Peterson** ("Peterson"), age 51, is a resident of Riverside, Illinois. He owns and controls Braverock Investments, Future Digital Markets, Windy Financial, and Future Financial. Peterson has not registered with the Commission in any capacity, nor has he ever

registered any of the Braverock Defendants with the Commission in any capacity.

25.     **Braverock Investments, LLC** ("Braverock Investments") is an Illinois company with its principal place of business in Chicago, Illinois that provided market making services in crypto asset securities. Braverock Investments has not registered with the Commission in any capacity.

26.     **Future Digital Markets, Inc.** ("Future Digital") is an Armenian corporation with its principal place of business in Chicago, Illinois that provided market making services in crypto asset securities. Future Digital has not registered with the Commission in any capacity.

27.     **Windy Financial LLC** ("Windy Financial") is a Delaware company with its principal place of business in Chicago, Illinois that provided market making services in crypto asset securities. Windy Financial has not registered with the Commission in any capacity.

28.     **Future Financial LLC** ("Future Financial") is a Delaware company with its principal place of business in Chicago, Illinois that provided market making services in crypto asset securities. Future Financial has not registered with the Commission in any capacity.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

29.     **Windy Blockchain Solutions LLC** ("Windy Blockchain") is an Illinois company with its principal place of business in Chicago, Illinois, which was involuntarily dissolved by the State of Illinois on September 29, 2020.

30.     **Dragonchain** is a Washington corporation with its principal place of business in Bellevue, Washington. It markets and purports to develop Dragonchain technology and "ecosystem." On August 16, 2022, the SEC filed a civil action against Dragonchain and others alleging that they conducted an unregistered offering of the crypto asset security DRGN. *SEC v. Dragonchain, Inc.*, 2:22-cv-01145 (W.D. Wash.).

31. **Chicago Crypto Capital LLC** ("CCC") is an Illinois limited liability company with its headquarters in Chicago, Illinois. CCC sells crypto assets and markets other blockchain-related investments. On September 14, 2022, the SEC filed a civil action against CCC and others alleging that they conducted an unregistered securities offering of BXY, acted as unregistered brokers, and engaged in securities fraud. *SEC v. Chicago Crypto Capital LLC*, 1:22-cv-04975 (N.D. Ill.).

## BACKGROUND ON CRYPTO ASSETS AND
## CRYPTO ASSET TRADING PLATFORMS

32. The term "crypto asset" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "digital assets," "cryptocurrencies," digital "coins," and digital "tokens."

33. A blockchain or distributed ledger is a database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.

34. Crypto assets are typically represented in one or more blockchains, meaning that records of their ownership and transfer are stored on each particular digital ledger or blockchain.

35. In regulatory compliant securities markets, participants register under the Exchange Act depending upon which of the various activities they undertake – including, for example, registration as a national securities exchange, as a broker-dealer, or as a clearing agency for securities. These functions are delineated to, among other things, provide Commission oversight and protect investors and their assets from conflicts and potential abuses that may arise when investors buy and sell securities.

36. Generally speaking, crypto asset platforms offer a variety of services relating to crypto assets, often including brokerage, trading, settlement, and custody. Crypto asset trading

platforms typically allow crypto assets to be bought and sold with fiat currency (legal tender issued by a governmental authority) or other crypto assets. Platforms might settle transactions "on-chain" (*i.e.*, by making transfers of assets from one blockchain address to another) or "off-chain" (*i.e.*, solely by making allocations between investors' accounts held by the platform).

37.     Crypto asset trading platforms like the Beaxy Platform may offer and sell crypto assets they call "exchange tokens," a crypto asset typically marketed as an investment in the platform's promoters' efforts to make the platform a success, including as an opportunity to trade more profitably on the platform.

38.     These platforms may provide marketplaces and facilities that bring together purchasers and sellers of securities like registered national securities exchanges do, and similarly display orders, establish rules for order interaction, and provide methods to match orders of buyers and sellers.

39.     As currently operating, crypto asset trading platforms, including the Beaxy Platform, frequently perform multiple functions that require separate registration and, in compliant securities markets, are handled by separate registered entities – exchanges, broker-dealers, and clearing agencies.

40.     For example, as further set forth below, the Beaxy Platform sought to generate customers' awareness of and interest in crypto assets, solicited customers for the purpose of effecting transactions in securities on their behalf, and accepted orders in securities from those customers. The Beaxy Platform also established and maintained functionality to match the orders in securities of multiple buyers and sellers, resulting in purchases and sales. Finally, the Beaxy Platform maintained a central securities depository for the settlement of securities transactions and acted as an intermediary in making payments or deliveries or both in connection with

transactions in securities effected on the Beaxy Platform.

41.     Moreover, platforms like the Beaxy Platform require users to deposit with the platform all of the crypto asset securities that they traded there, resulting in the platform possessing, and even becoming the legal owner of such assets and thus a central securities depository. This type of arrangement means that an unregistered crypto asset platform like the Beaxy Platform could use assets in their possession and control for its own purposes, thereby exposing investors to significant and at times undisclosed risk of loss of their assets. Investors who invest through such a platform may face a risk that, if the platform were to enter bankruptcy, they might not be able to withdraw their assets and would become unsecured creditors of the bankruptcy estate.

42.     On national securities exchanges, by contrast, investors interact through broker-dealer intermediaries that effect transactions in securities on behalf of investors. The exchange does not take possession or control of the underlying assets being traded.

43.     The Beaxy Platform also performed a settlement function when it updated its internal ledger of each investor's positions following execution of a trade. In the regulated securities markets, this settlement typically is carried out by clearing agencies.

44.     The Beaxy Platform, as further set forth below, also performed functions traditionally performed by broker-dealers in traditional securities markets, without registering as a broker-dealer and thereby subjecting itself to the legal obligations and restrictions on activities that accompany status as a broker or dealer.

45.     The Beaxy Platform also had the ability to trade crypto asset securities against its own customers, which gives it the means and the motive to put itself on the winning side of each trade, without regard to obligations that apply to registered broker-dealers.

46.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (the "DAO Report"), advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of digital assets at issue in the DAO Report were investment contracts and, therefore, securities.

47.     The DAO Report also advised that "any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption from such registration," and "stress[ed] the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces." The DAO Report also found that the platforms at issue there "provided users with an electronic system that matched orders from multiple parties to buy and sell [the crypto asset securities at issue] for execution based on non-discretionary methods" and therefore "appear to have satisfied the criteria" for being an exchange under the Exchange Act.

## FACT ALLEGATIONS

**A.     Beaxy Digital Issued Beaxy Crypto Assets.**

48.     In or around 2018, Beaxy Digital sought to develop the Beaxy Platform, a web-based system for carrying out multiple functions with respect to crypto assets, which it planned to launch in 2019.

49.     At that time, Hamazaspyan controlled the majority of Beaxy Digital's outstanding shares and was the final decision-maker with regard to Beaxy Digital and the Beaxy Platform.

50.     At that time, Hamazaspyan also controlled Windy Blockchain, a company whose

11

bank account he used to receive deposits of Beaxy Digital's investment proceeds and pay for Beaxy Digital's business expenditures.

51.     To fund the development of the Beaxy Platform and related applications, Beaxy Digital began selling BXY, offered and sold as security, in approximately 2018. BXY purchasers invested in a common enterprise with an expectation of profits derived from the efforts of others.

52.     Specifically, from January 2018 through June 2019, Beaxy Digital conducted a so-called "private sale" of yet-to-be created BXY in the form of so-called "Simple Agreements for Future Tokens," which were executed by Hamazaspyan in his capacity as the President of Beaxy Digital.

53.     The offering raised approximately $8 million worth of bitcoin, ether, and fiat currency from approximately 200 investors, including investors in the United States.

54.     During this "private sale," Beaxy Digital offered BXY at various discounts, which fluctuated over time and based on the amount purchased.

**B.     Beaxy Digital and Hamazaspyan Marketed BXY by Promoting its Profit Potential as Tied to the Success of the Beaxy Platform.**

55.     Beaxy Digital and Hamazaspyan identified "private sale" purchasers through Hamazaspyan's business relationships as well as through their own public marketing and marketing by crypto asset influencers retained by Beaxy Digital and Hamazaspyan. They targeted their marketing efforts to persons who would seek to derive profit from the increase in BXY's trading value.

56.     Beaxy Digital also engaged at least one third-party reseller, CCC, to solicit investors.

57.     Beaxy Digital's offering materials to the "private sale" purchasers ("Offering Materials"), which Hamazaspyan approved and directed to be distributed, stated that crypto

assets issued by "exchanges" had been the most profitable initial coin offerings in 2018 and that "exchanges are where the profits are."

58.     With statements such as these, Beaxy Digital and Hamazaspyan sought to entice "private sale" purchasers to buy BXY by pointing out that they will be able to profit from the future increase in the price of BXY.

59.     The Offering Materials also stated that BXY was "speculative," and made other representations that the value of BXY was tied to Beaxy Digital's ability to operate a profitable crypto asset platform.

60.     The Offering Materials stated that the BXY sales proceeds would be pooled and used to develop the Beaxy Platform. For example, the Offering Materials specified that the offering proceeds would be used to develop the Beaxy Platform infrastructure, operations, marketing, customer support, and legal and regulatory compliance. The Offering Materials also stated that Beaxy Digital would reserve 40% of all BXY to be able to "operate for up to 2 years without making a profit."

61.     By publicly stating that Beaxy Digital would reserve nearly half of all BXY, Beaxy Digital signaled to reasonable investors that Beaxy Digital had a strong financial incentive to undertake efforts to increase BXY's value.

62.     Neither Beaxy Digital nor Hamazaspyan set up separate or segregated accounts to manage BXY investors' assets. To the contrary, as noted, the Offering Materials stated that Beaxy Digital would pool proceeds and use them fungibly to develop the Beaxy Platform.

63.     In its publicly-available "Whitepaper," a document commonly used by crypto asset projects to describe its technical and operational plans, Beaxy Digital touted the credentials and experience of its team. Specifically, the Beaxy Whitepaper described Hamazaspyan as "the

'founding father' of Beaxy" who "has worked 10 years in software development" and had "prior experience in leading businesses."

64.     The Beaxy Whitepaper also described several Beaxy Digital software developers and engineers as team members with over 10 years of development experience each and highlighted their software and computer engineering degrees.

65.     The Beaxy Whitepaper also highlighted the Beaxy Digital business personnel's training and "expert[ise]" in "helping businesses grow quickly."

66.     After launching the Beaxy Platform in June 2019, Beaxy Digital and Hamazaspyan sought to attract "traditional traders, retail investors and institutional investors" to trade crypto assets on the Beaxy Platform. They, therefore, sought to attract the types of purchasers who buy crypto assets for investment purposes.

67.     In addition to reviewing and approving these materials, Hamazaspyan personally participated in solicitation meetings with investors.

68.     As stated in Beaxy Digital's marketing materials, users could opt to pay their Beaxy Platform trading fees in BXY at a discounted rate or to use other crypto assets.

**C.      Beaxy Digital and Hamazaspyan Sold BXY to Unaccredited Crypto Investors.**

69.     In its Offering Materials, Beaxy Digital stated that the "private sale" of BXY was limited to non-U.S. persons or accredited U.S. investors.

70.     In the offering, however, Beaxy Digital and Hamazaspyan directed selling efforts into the U.S. and sold BXY to U.S. persons. U.S. investors purchased BXY during the sale and at least some of the purchasers signed forms self-certifying that they were either "accredited" or "foreign investors."

71.     Beaxy Digital did not have any processes or controls in place – and took no steps

– to verify the investors' accreditation status.

72.     In fact, Beaxy Digital explicitly instructed a CCC salesperson to seek investments from non-accredited U.S. investors, which the salesperson did by posting solicitation messages on social media.

**D.     Beaxy Digital and Hamazaspyan Placed No Restrictions on Resale of BXY.**

73.     Beaxy Digital did not take any steps to limit resales of BXY by the "private sale" purchasers, and did not require investors to hold their BXY for any period of time after purchase.

74.     Beaxy Digital and Hamazaspyan also facilitated trading in BXY by making them available to trade on the Beaxy Platform.

75.     BXY sold in the original offering and on the Beaxy Platform were all fungible with each other, and each investor's *pro rata* ownership of BXY rose or decreased in value together with all other investors' ownership of BXY.

76.     Moreover, immediately before the public launch of the Beaxy Platform, Hamazaspyan instructed the development team to ensure that the platform could handle a large volume of transactions because: (1) he expected purchasers to be selling the discounted BXY they obtained in the "private sale"; and (2) the Beaxy Platform was the only place where purchasers could trade BXY.

77.     Beaxy Digital also hired market makers to provide liquidity for BXY trading and provided the market makers with a pool of BXY to facilitate liquidity.

78.     Beaxy Digital allowed all private sale purchasers to sell their BXY on the Beaxy Platform without any restrictions as to the accredited or foreign status of the purchasers.

**E.     Hamazaspyan Misappropriated Offering Proceeds.**

79.     As noted, in the BXY Offering Materials, which Hamazaspyan approved, Beaxy

Digital informed its investors that it would use the proceeds to develop, market, and operate the Beaxy Platform and explicitly tied the value of BXY to the success of the Beaxy Platform and the efforts of Beaxy Digital's management.

80.     Hamazaspyan's representations about the use of proceeds were false. In reality, between March and August 2019, Hamazaspyan made ten cash withdrawals totaling $900,000 from Windy Blockchain's bank account, which had been funded by proceeds from the 2018 and 2019 private sales of BXY to investors.

81.     Hamazaspyan used these funds for his personal use, including gambling. By misappropriating offering proceeds, Hamazaspyan acted knowingly or recklessly and with the intent to defraud BXY investors.

**F.     Murphy and Abbott Took Control of the Beaxy Platform.**

82.     When Hamazaspyan's misappropriation was discovered in 2019, Murphy and Abbott, managers at Beaxy Digital at the time, convinced Hamazaspyan to separate from all Beaxy-affiliated entities, relinquish control over all of the Beaxy Platform's business, including business bank and crypto asset accounts and wallets, and pay back $420,000 (out of the $900,000 that Hamazaspyan misappropriated) to Windy and Beaxy Digital, thereby leaving $480,000 of the misappropriated funds outstanding.

83.     As part of Hamazaspyan's separation, Murphy and Abbott received full control over Windy and began operating the Beaxy Platform through Windy.

84.     As a result, from October 2019 to the present, Murphy and Abbott acted as control persons of Windy and the Beaxy Platform.

85.     In October and November 2019, Murphy and Abbott used the funds received from Hamazaspyan, as well as a loan from a third party, to continue operating the Beaxy

Platform.

**G.      Windy Maintained and Provided the Beaxy Platform as an Unregistered Exchange.**

86.     From October 2019 to the present, Windy operated the Beaxy Platform from the internet address beaxy.com 24 hours per day, seven days per week, and had support staff available on social media platforms during those hours.

87.     At its height, the Beaxy Platform had a total of approximately 2,300 users, approximately 855 of whom were located in the United States, and over the course of its history has executed over 1 million transactions.

88.     The Beaxy Platform website and other marketing materials stated that the Beaxy Platform was an "exchange" that sought to attract "traditional traders, retail investors and institutional investors" as users.

89.     Through the Beaxy Platform, Windy brought together the orders of multiple buyers and sellers for crypto assets securities, including BXY.

90.     Users were allowed to enter on the Beaxy Platform limit orders, market orders, and stop-market orders, with time in-force instructions or other parameters such as fill-or-kill, immediate-or-cancel, good-till-cancelled, good-till-date, and good-till-crossing.

91.     The Beaxy Platform allowed users to purchase crypto asset securities in exchange for both fiat funds and other crypto assets.

92.     The Beaxy Platform displayed to all of its users orders of crypto asset securities that rested in the Beaxy Platform order book. Order information displayed to users from the order book included the crypto asset security, side, size, and price.

93.     The Beaxy Platform included a trading facility through its software-based automated matching engine. The matching engine was programmed with rules that determined

how orders would interact and allowed users entering such orders to agree to the terms of a trade. For example, an order entered into the matching engine would match with an order resting on the order book based on a price-time priority basis. The Beaxy Platform also had publicly-available "Trading Rules" that governed order size, execution, and pricing.

94. Accordingly, Windy used established, non-discretionary methods through the provision of the Beaxy Platform order matching trading facility.

95. Before a user could trade on the Beaxy Platform, the Beaxy Platform required the user to deposit with it any fiat funds or crypto assets that the user wished to trade.

96. The Beaxy Platform kept all fiat funds in bank accounts that Windy controlled, and kept crypto assets being transacted in wallets Windy controlled, rather than in the users' own wallets.

97. When a transaction took place, the Beaxy Platform carried out "off-chain settlement." In other words, it adjusted the user balances on its internal ledger and only transferred crypto assets through a blockchain transaction when a user requested a withdrawal.

98. On beaxy.com, Windy described how transactions and user balances worked as follows: (1) the Beaxy Platform held customers' assets (both funds and crypto asset securities) in bank accounts and digital wallets Windy controlled; (2) it held such assets as "custodial assets … for [its customers'] benefit"; (3) the assets were "not segregated" by customer, but tracked on "separate ledgers"; and (4) an algorithm would "settle filled orders immediately, by modifying the appropriate [crypto asset] balances in users' accounts accordingly."

99. Accordingly, Windy held custody of all assets and fiat funds on behalf of its users until the user requested withdrawals of such assets and funds.

100. Through beaxy.com and social media channels, Windy, Murphy, and Abbott

solicited investors to purchase crypto asset securities.

101.     The Beaxy Platform charged a fee on each transaction it executed, and these fees flowed directly to Windy, constituting Windy's revenue.

102.     To date, Windy has received $10,779 that the Beaxy Platform collected as transaction fees in connection with transactions involving crypto asset securities.

103.     Despite providing and maintaining the Beaxy Platform as a marketplace for crypto asset securities, Windy did not register as a national securities exchange.

**H.     Windy Reviewed Crypto Assets Offered and Sold on the Beaxy Platform.**

104.     In February and September 2020, Murphy and Abbott oversaw and managed a review of certain crypto assets offered by the Beaxy Platform to determine whether to allow them to continue trading.

105.     During this process, Windy removed several crypto assets, primarily due to the low volume of trading in these crypto assets.

106.     Windy asked the issuers of these crypto assets to reapply for the assets to be made available on the Beaxy Platform by responding to a questionnaire and retaining a market maker that would provide liquidity for their crypto asset on the Beaxy Platform.

107.     As a result of this process, in 2020, Windy removed certain crypto assets from the Beaxy Platform, including DRGN.

108.     Dragonchain reapplied to Windy to add DRGN back on the Beaxy Platform. Attached to Dragonchain's application was a memorandum that concluded that DRGN was not a security as long as Dragonchain would "avoid soliciting and participating in the creation of a secondary marketplace for [DRGN] so as to decrease the likelihood that prospective purchasers would be found to have a reasonable expectation for profits using such a marketplace," and as

19

long as Dragonchain's Offering Materials would target purchasers with technical ability to use DRGN for its "utility."

109.    Murphy and Abbott generally participated in the discussions with Dragonchain about its application, were copied on the email attaching this reapplication memorandum, and Abbott signed the agreement on behalf of Windy.

110.    As a result of this process, in the summer of 2020, Windy added back DRGN to the Beaxy Platform.

111.    Neither Windy, Murphy, nor Abbott took any steps to confirm whether Dragonchain in fact limited its offerings of DRGN to users with any specific technical ability, as the memorandum specified.

112.    Throughout this process, Windy, Murphy, and Abbott never undertook any analysis or made any explicit decision as to whether to remove BXY from the Beaxy Platform.

113.    As a result, BXY continued to trade on the Beaxy Platform after Murphy and Abbott took over its operation.

114.    As of 2023, the crypto asset securities BXY and DRGN, among others, were still available for trading on the Beaxy Platform.

## I.    Windy Acted as an Unregistered Broker.

115.    Windy was not registered with the SEC as a broker-dealer at any time.

116.    Windy was engaged in a regular business of effecting transactions in crypto asset securities for the account of others, participating in over a million transactions on behalf of at least 2,300 customers that occurred "at key points in the chain of distribution."

117.    Namely, Windy actively solicited and recruited investors by regularly advertising the features of the Beaxy Platform on beaxy.com and social media channels.

118.    Moreover, as described above, Windy helped to facilitate those transactions by assisting customers in opening accounts and regularly handled customer funds and securities, as described above.

119.    For these services, the Beaxy Platform charged a fee on each transaction it executed and these fees flowed directly to Windy.

120.    By engaging in these activities, Windy was acting as an unregistered broker.

**J.      Windy Acted as an Unregistered Clearing Agency.**

121.    Windy was not registered with the SEC as a clearing agency at any time.

122.    According to the Beaxy Platform's terms and conditions made available on its website and provided to users, Windy held all crypto asset securities as "custodial assets for [its customers'] benefit" in Windy-controlled wallets, where they were "not segregated" by customer.

123.    When a transaction was executed, Windy settled the transaction using bookkeeping entries that simply adjusted its "separate ledgers" for each crypto asset and modified "balances in users' accounts," rather than moving the assets on the blockchain.

124.    The terms and conditions also stated that Windy allowed users to create fiat currency accounts for funding purchases of crypto asset securities and digital asset accounts for holding such crypto asset securities. As noted above, the Beaxy Platform settled transactions off-chain.

125.    By engaging in these activities, Windy acted as an unregistered clearing agency.

**K.      Peterson and the Braverock Defendants Acted as Unregistered Dealers.**

126.    Neither Peterson nor the Braverock Defendants were registered as dealers with the SEC.

21

127. Peterson, through the Braverock Defendants, engaged in a regular business of buying and selling securities for its own account.

128. In December 2019, the Braverock Defendants, which are owned and controlled by Peterson, executed a market making agreement with Windy.

129. The agreement stated that Windy sought "to have more influence over the shape of [BXY's] liquidity" and was retaining Braverock Defendants "to trade on agency basis on [Windy's] behalf."

130. According to the agreement, Braverock Defendants would utilize Windy's staff, servers, email accounts, and capital and provide Braverock Defendants' intellectual property in the form of market making algorithmic software and expertise in order to make markets for BXY.

131. Windy also provided Braverock Defendants with the crypto assets with which Braverock Defendants could provide liquidity for BXY.

132. In exchange for its market making services, Windy agreed to pay Braverock Defendants a flat monthly fee of $10,000, but these payments would be deferred until Windy became "cash flow positive," which has yet to happen.

133. Although the crypto assets with which Braverock Defendants made markets for BXY were owned by Windy, Braverock Defendants used accounts in the name of Braverock Defendants for all the trades they executed on the Beaxy Platform.

134. Similarly, in May 2020, Dragonchain executed a market making agreement with one of the Braverock Defendants, Windy Financial.

135. Dragonchain executed the agreement because Windy requested Dragonchain to retain a market maker in order to increase the volume of transactions in DRGN on the Beaxy

Platform. Windy recommended that Dragonchain retain Windy Financial as its market maker.

136.     The agreement stated that Dragonchain sought "market making services … to ensure predictability to the liquidity" in DRGN trading. Pursuant to the agreement, Dragonchain paid Windy Financial a flat monthly fee of $2,000 and Dragonchain provided all assets with which Windy Financial would trade.

137.     Windy Financial made markets for DRGN on the Beaxy Platform by trading out of accounts in its own name.

138.     To date, Windy Financial received approximately $52,000 in monthly fees from Dragonchain.

139.     For both BXY and DRGN, Peterson and the Braverock Defendants set up algorithms that created and controlled trading accounts on multiple crypto asset trading platforms, including the Beaxy Platform. The algorithm was designed to enter orders to buy or sell BXY and DRGN at a variety of prices and volumes, and supported liquidity of the two crypto assets because it allowed other Beaxy Platform users interested in buying or selling these assets to find a counter-party even when other users were less active in these assets.

140.     The orders entered by the market maker were not identified as involving a market maker in the order books. Therefore, a Beaxy Platform user would not know whether, in a particular transaction, they were transacting with a market maker or another user.

141.     As a result of this conduct, Peterson and the Braverock Defendants acted as unregistered dealers.

## COUNT I

### Violations of Section 5(a) and (c) of the Securities Act
### (against Defendants Beaxy Digital and Hamazaspyan)

142.     The SEC repeats, realleges, and incorporates by reference paragraphs 1 through

141, as though fully set forth therein.

143.    By reason of the acts and conduct described in this Complaint, Defendants Beaxy

Digital and Hamazaspyan, directly or indirectly, singly and in concert with others, have: (a)

made use of the means and instruments of transportation or communication in interstate

commerce and of the mails to sell, through the use or medium of any prospectus or otherwise,

securities as to which no registration statement was in effect; and/or (b) for the purpose of sale or

delivery after sale, carried and caused to be carried through the mails and interstate commerce,

by the means and instruments of transportation, securities as to which no registration statement

was in effect; and/or (c) made use of the means and instruments of transportation or

communication in interstate commerce and of the mails to offer to sell, through the use or

medium of any prospectus or otherwise, securities as to which no registration statement had been

filed.

144.    By reason of the foregoing, Defendants Beaxy Digital and Hamazaspyan, directly

or indirectly, violated, are violating, and, unless enjoined, will continue to violate Section 5(a)

and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c).

## COUNT II

**Violations of Exchange Act Section 10(b) and Rule 10b-5
(against Defendant Hamazaspyan)**

145.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through

141, as though fully set forth therein.

146.    By reason of the acts and conduct described in this Complaint, Defendant

Hamazaspyan, directly or indirectly, in connection with the purchase or sale of securities, by the

use of means or instrumentalities of interstate commerce or of the mails: (a) used and employed

devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted

to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon any person.

147.    Defendant Hamazaspyan intentionally or recklessly engaged in the fraudulent conduct described above.

148.    By reason of the foregoing, Defendant Hamazaspyan, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

## COUNT III

### Violations of Securities Act Section 17(a)
### (against Defendant Hamazaspyan)

149.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 141, as though fully set forth therein.

150.    By engaging in the acts and conduct described in this Complaint, Defendant Hamazaspyan, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) employed devices, schemes, and artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon purchasers or prospective purchasers.

151.    Defendant Hamazaspyan intentionally, recklessly, or negligently engaged in the fraudulent conduct described above.

152.    By reason of the foregoing, Defendant Hamazaspyan, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## COUNT IV

### Violations of Exchange Act Section 5
### (against Defendant Windy)

153.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 141, as though fully set forth therein.

154.    By engaging in the acts and conduct described in this Complaint, Defendant Windy, an exchange, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect and report transactions in a security without being registered as national securities exchange under Exchange Act Section 6, 15 U.S.C. § 78f.

155.    By reason of the foregoing, Defendant Windy, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 5, 15 U.S.C. § 78e.

## COUNT V

### Violations of Exchange Act Section 15(a)
### (against Defendant Windy)

156.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 141, as though fully set forth therein.

157.    By engaging in the acts and conduct described in this Complaint, Defendant Windy, a person other than a natural person under the Exchange Act, is a broker by and made use of the mails and the means and instrumentalities of interstate commerce to effect any

transactions in, or to induce or attempt to induce the purchase or sale of, any security, without registering as a broker-dealer.

158.    By reason of the foregoing, Defendant Windy, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 15(a), 15 U.S.C. § 78o(a).

## COUNT VI

### Violations of Exchange Act Section 17A
### (against Defendant Windy)

159.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 141, as though fully set forth therein.

160.    By engaging in the acts and conduct described in this Complaint, Defendant Windy, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce to perform the functions of a clearing agency with respect to securities, without registering in accordance to Section 17A(b) of the Exchange Act.

161.    By reason of the conduct described above, Defendant Windy, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 17A(b), 15 U.S.C. § 78q-1.

## COUNT VII

### Violations of Exchange Act Sections 5, 15(a), and 17A(b)
### (against Defendants Murphy and Abbott as Control Persons over Defendant Windy)

162.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 141, as though fully set forth therein.

163.    As alleged above, Defendant Windy violated Sections 5, 15(a), and 17A of the Exchange Act, 15 U.S.C. §§ 78e, 78o(a), 78q-1.

164.    At all relevant times, Defendants Murphy and Abbott were control persons of Defendant Windy for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

165.    At all relevant times, Defendants Murphy and Abbott exercised power and control over Defendant Windy, including by managing and directing that entity, and by directing and participating in the acts constituting Defendant Windy's violations of the securities laws.

166.    By reason of the foregoing, Defendants Murphy and Abbott are liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for Defendant Windy's violations of the Sections 5, 15(a), and 17A of the Exchange Act, 15 U.S.C. §§ 78e, 78o(a), 78q-1.

## COUNT VIII

### Violations of Exchange Act Section 15(a)
### (against Defendants Peterson, Braverock Investments, Future Digital, Windy Financial, and Future Financial)

167.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 141, as though fully set forth therein.

168.    By engaging in the acts and conduct described in this Complaint, Defendant Peterson, a natural person under the Exchange Act, and Defendants Braverock Investments, Future Digital, Windy Financial, and Future Financial, persons other than natural persons under the Exchange Act, are dealers and made use of the mails and the means and instrumentalities of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security, without registering as dealers.

169.    By reason of the foregoing, Defendants Peterson, Braverock Investments, Future Digital, Windy Financial, and Future Financial, directly or indirectly, violated, are violating, and, unless enjoined, will continue to violate Exchange Act Section 15(a), 15 U.S.C. § 78o(a).

## **PRAYER FOR RELIEF**

**WHEREFORE,** the SEC respectfully requests that the Court:

### **I.**

Find that Defendants committed the violations alleged herein;

### **II.**

Issue orders of permanent injunction restraining and enjoining Defendants Beaxy Digital, Hamazaspyan, Murphy, Abbott, Windy, Braverock Investments, Future Digital, Windy Financial, Future Financial, and Peterson, as well as their offers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from directly or indirectly violating the statutes and rules set forth in this Complaint as to each;

### **III.**

Issue orders of permanent injunction, pursuant to Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5), restraining and enjoining each of Defendants Beaxy Digital and Hamazaspyan from participating, directly or indirectly, in any securities offering; provided, however, that such injunction shall not prevent Defendant Hamazaspyan from purchasing or selling securities other than BXY for his own personal account;

### **IV.**

Order Defendants Beaxy Digital, Hamazaspyan, Windy, Braverock Investments, Future Digital, Windy Financial, Future Financial, and Peterson to disgorge all ill-gotten gains derived from their illegal conduct as set forth in this Complaint, including prejudgment interest thereon pursuant to Section 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act, 15 U.S.C. § 78u(d)(3), (d)(5), and (d)(7);

**V.**

Order Defendants Beaxy Digital, Hamazaspyan, Murphy, Abbott, Windy, Braverock Investments, Future Digital, Windy Financial, Future Financial, and Peterson to pay civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3);

**VI.**

Pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibit Defendant Hamazaspyan from serving as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports under Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d);

**VII.**

Grant such other and further relief as the Court determines to be necessary and appropriate for the protection of investors; and

**VIII.**

Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff SEC demands that this case be tried to a jury.

Date: March 29, 2023

Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

*/s/ Alyssa A. Qualls*
Alyssa A. Qualls (QuallsA@sec.gov)
Arsen R. Ablaev (AblaevA@sec.gov)
Christine B. Jeon (JeonC@sec.gov)
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Phone: (312) 353-7390 | Fax: (312) 353-7398

*Attorneys for Plaintiff*