IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br>    v.<br><br>BEAXY DIGITAL, LTD., ARTAK HAMAZASPYAN, WINDY INC., NICHOLAS MURPHY, RANDOLPH BAY ABBOTT, BRAVEROCK INVESTMENTS, LLC, FUTURE DIGITAL MARKETS, INC., WINDY FINANCIAL LLC, FUTURE FINANCIAL LLC, and BRIAN PETERSON,<br><br>        Defendants. | Civil Action No. 1:23-cv-1962<br><br>Hon. LaShonda A. Hunt |

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST
<u>DEFENDANTS BEAXY DITIGAL, LTD. AND ARTAK HAMAZASPYAN</u>

Alyssa A. Qualls (QuallsA@sec.gov)
Arsen R. Ablaev (AblaevA@sec.gov)
United States Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Phone: (312) 353-7390
Fax: (312) 353-7398

*Attorneys for Plaintiff*
*United States Securities and Exchange Commission*

Plaintiff United States Securities and Exchange Commission ("SEC"), respectfully moves this Court to enter a default judgment against the two remaining defendants in this case, Beaxy Digital, Ltd. ("Beaxy Digital") and Artak Hamazaspyan ("Hamazaspyan") (collectively, "Defaulting Defendants"), and order the requested equitable and financial remedies.

## STATEMENT OF FACTS

The SEC filed its Complaint on March 29, 2023, alleging that from approximately January 2018 through June 2019, Beaxy Digital and its founder Hamazaspyan conducted an unregistered private sale of a crypto asset security called BXY, illegally raising $8 million in proceeds through unregistered offers and sales of BXY to approximately 200 investors in the United States and abroad. (ECF No. 1.) Beaxy Digital was served on April 14, 2023. (ECF No. 26 ¶ 5.) Hamazaspyan, an Armenian citizen and resident, was served on July 31, 2023 by email with leave of this Court. (ECF Nos. 34, 35 ¶ 3.) In addition, on August 9, 2023, Hamazaspyan's representative was personally served in the Republic of Armenia in accordance with the Hague Convention. (ECF No. 42.) Defaulting Defendants failed to answer or respond to the Complaint. The SEC moved for entry of default pursuant to Rule 55(a), which the Court granted on September 14, 2023. (ECF. No. 36.) On September 15 and 20, 2023, the SEC served Defaulting Defendants with this Order. (Qualls Decl. ¶¶ 3-5.) On October 18, 2023, the Clerk of Court entered defaults. (ECF No. 39.) Defaulting Defendants are not minors or incompetent persons. (Qualls Decl. ¶ 6.) The SEC now moves for a default judgment against Defaulting Defendants.

**A.    Beaxy Digital Issued Beaxy Crypto Assets.**

In or around 2018, Beaxy Digital sought to develop the Beaxy Platform, a web-based system for carrying out multiple functions with respect to crypto assets, which it planned to launch in 2019. (ECF 1, ¶ 48.) At that time, Hamazaspyan controlled the majority of Beaxy Digital's outstanding shares and was the final decision-maker for Beaxy Digital and the Beaxy

Platform. (*Id.* ¶ 49.) Hamazaspyan also controlled Windy Blockchain Solutions, LLC ("Windy Blockchain"), an Illinois company whose bank account received deposits of Beaxy Digital's investment proceeds in fiat currency and paid Beaxy Digital's business expenses. (*Id.* ¶¶ 29, 50.)

From approximately January 2018 through June 2019, to fund the development of the Beaxy Platform, Beaxy Digital and Hamazaspyan conducted an unregistered so-called "private sale" of a yet-to-be created crypto asset security called BXY, illegally raising $8 million worth of bitcoin, ether, and fiat currency from approximately 200 investors in the U.S. and abroad. (ECF No. 1, ¶¶ 52-53; *see also* McShane Decl. ¶ 8 & Exs. E & F.) The "private sale" took the form of a "Simple Agreement for Future Tokens" (or "SAFT"), which Hamazaspyan executed in his capacity as Beaxy Digital's President. (ECF No. 1 ¶ 52; Exs. A-C, McShane Decl.)

**B.   Beaxy Digital and Hamazaspyan Marketed BXY by Promoting its Profit Potential as Tied to the Success of the Beaxy Platform.**

Defaulting Defendants identified investors through Hamazaspyan's business relationships, their own marketing, and marketing by retained crypto asset influencers. (ECF No. 1 ¶ 55.) Beaxy Digital also engaged one third-party reseller, Chicago Crypto Capital LLC ("CCC"),[1] an unregistered broker, to solicit investors. (*Id.* ¶ 56.) Defaulting Defendants targeted persons who would seek to derive profit from the increase in BXY's trading value. (*Id.* ¶ 55.)

Beaxy Digital's offering materials to the private sale purchasers ("Offering Materials"), which Hamazaspyan approved and directed to be distributed, sought to entice purchasers to buy BXY by pointing out that they will profit from increases in the price of BXY. (ECF No. 1 ¶ 58.) The Offering Materials stated that the value of BXY was tied to Beaxy Digital's ability to

---

[1] On September 14, 2022, the SEC filed an action against CCC and others alleging that they conducted an unregistered offering of BXY, acted as unregistered brokers, and engaged in securities fraud. *SEC v. Chicago Crypto Capital LLC*, 1:22-cv-04975-JRB (N.D. Ill.). On May 10, 2023, the Court entered default judgments against all CCC defendants. (ECF Nos. 22, 23.)

operate a profitable crypto asset platform and explained how the BXY sales proceeds would be pooled and used to develop the infrastructure, operations, marketing, customer support, and legal and regulatory compliance of the Beaxy Platform. (*Id.* ¶¶ 59-60.) The Offering Materials also stated that Beaxy Digital would reserve 40% of BXY to be able to "operate for up to 2 years without making a profit." (*Id.* ¶¶ 60-61.)

Moreover, in its "Whitepaper," Beaxy Digital touted the credentials and experience of its team. (ECF No. 1 ¶ 63; *see also* Ex. B, McShane Decl.) The BXY Whitepaper described Hamazaspyan as "the 'founding father' of Beaxy" who "has worked 10 years in software development" and had "prior experience in leading businesses." (ECF No. 1 ¶ 63.) It also described several Beaxy Digital software developers and engineers as team members with over 10 years of experience each and highlighted their degrees, training, and expertise in "helping businesses grow quickly." (*Id.* ¶¶ 64-65.) In addition to approving the Offering Materials and BXY Whitepaper, Hamazaspyan personally participated in soliciting investors. (*Id.* ¶ 67.)

**C.     Beaxy Digital and Hamazaspyan Sold BXY to Unaccredited Crypto Investors.**

Although the Offering Materials stated that the private sale of BXY was limited to non-U.S. persons or accredited U.S. investors, Defaulting Defendants directed selling efforts into the U.S. and sold BXY to U.S. persons. (*Id.* ¶¶ 69-70.) U.S. investors purchased BXY during the private sale and at least some of them signed forms self-certifying that they were either "accredited" or "foreign investors." (*Id.* ¶ 70.) Beaxy Digital did not have any processes or controls to verify the investors' accreditation status. (*Id.* ¶ 71.) In fact, Beaxy Digital explicitly instructed a CCC salesperson to seek investments from non-accredited U.S. investors. (*Id.* ¶ 72.)

**D.     Beaxy Digital and Hamazaspyan Placed No Restrictions on Resale of BXY.**

Beaxy Digital did not take any steps to limit private sale purchasers from reselling BXY and did not require investors to hold BXY for any period of time. (*Id.* ¶ 73.) To the contrary,

3

Defaulting Defendants facilitated trading by making BXY available to trade on the Beaxy Platform, which launched in June 2019. (*Id.* ¶¶ 66, 74.) BXY sold in the offering and on the Beaxy Platform were fungible, and each investor's *pro rata* ownership of BXY rose or decreased in value together with all other investors' ownership of BXY. (*Id.* ¶ 75.) Hamazaspyan expected a large trading volume on the Beaxy Platform because investors could sell discounted BXY without restriction, BXY traded exclusively on the Beaxy Platform, and Beaxy Digital provided market makers with a pool of BXY to provide trading liquidity. (*Id.* ¶¶ 8, 76-78, 86, 98.)

**E.     Hamazaspyan Misappropriated Offering Proceeds.**

Although the Offering Materials, which Hamazaspyan approved, represented to investors that investor proceeds would be used to develop the Beaxy Platform, these representations were false. (ECF No. 1 ¶¶ 79, 80.) In reality, between March and August 2019 (during the offering and for three months thereafter), Hamazaspyan made nine cash withdrawals totaling $900,000 from Windy Blockchain's bank account, which had been funded by proceeds from the private sales of BXY to investors. (*Id.* ¶¶ 4, 80; McShane Decl. ¶¶ 10, 17.) Hamazaspyan used the misappropriated funds for his personal use, including gambling. (ECF No. 1 ¶ 81.) After Hamazaspyan's misappropriation was discovered, he resigned and paid back only $420,000, leaving $480,000 outstanding. (*Id*. ¶ 82.)

## ARGUMENT

Under Federal Rule of Civil Procedure 55, "[t]here are two stages in a default proceeding: the establishment of the default, and the actual entry of a default judgment." *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004); *see* Fed. R. Civ. P. 55. Defaulting Defendants failed to respond to the Complaint and, on September 14, 2023, the Court ordered an entry of default. (ECF No. 37.) The SEC served this Order on Defaulting Defendants. (Qualls Decl. ¶¶ 3-5.) On October 18, 2023, the Clerk entered the defaults. (ECF No. 39.) Based on the entry of default,

liability has been established. *See Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012); *In re Catt*, 368 F.3d at 793. The only thing that remains is the amount of the default judgment.

At this stage, "the well-pled allegations of the complaint relating to liability are taken as true, but those relating to the amount of damages suffered ordinarily are not." *Wehrs*, 688 F.3d at 892. The SEC must demonstrate it is entitled to relief. *In re Catt*, 368 F.3d at 793. Courts do so without a hearing where, as here, the amount of relief may be determined from a declaration. *See, e.g.*, *SEC v. Glick*, No. 17 C 2251, 2019 WL 78958, at *8 (N.D. Ill. Jan. 2, 2019).

**I.    Defaulting Defendants are Liable for Selling Securities in an Unregistered Offering and Hamazaspyan is Liable for Securities Fraud.**

For the avoidance of doubt, the Complaint establishes Defaulting Defendants' liability.

**A.    Defaulting Defendants Offered and Sold BXY Tokens as Securities.**

As a threshold matter, the BXY tokens were offered and sold as securities.[2] Under Securities Section 2(a)(1) and Exchange Act Section 3(a)(10), a security includes "an investment contract." An investment contract is "a contract, transaction or scheme whereby a person (1) invests his money (2) in a common enterprise and (3) is led to expect profits (4) solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946); *see also Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984) (adopting the *Howey* test). These basic principles apply to the offer and sale of crypto assets, which can be offered and sold as securities if the *Howey* test is met. *See, e.g.*, *SEC v. LBRY, Inc.*, No. 21-cv-00260-PB, 2022 WL 16744741, at *3 (D.N.H. Nov. 11, 2022); *SEC v. Terraform Labs Pte. Ltd., et al.*, No. 23-cv-1346-JSR, 2023 WL 8944860, at *13-16 (S.D.N.Y. Dec. 28, 2023).

---

[2] This Court has already found that BXY tokens were offered and sold as securities. In *SEC v. Chicago Crypto Capital LLC*, 1:22-cv-04975-JRB (N.D. Ill.), the Court granted the SEC's motion for default judgment against CCC and others who were charged with, among other things, conducting unregistered offerings and sales of BXY tokens in violation of Section 5 of the Securities Act and entered default judgments against them. (ECF Nos. 22-23.)

5

In this case, the BXY tokens were offered and sold as investment contracts because there was an investment of money in a common enterprise, with a reasonable expectation of profits from the essential managerial efforts of others. The investors made investments of money when they paid a total of $8 million worth of bitcoin, ether, and fiat currency to purchase BXY. (ECF No. 1 ¶ 53.) The investors' money was part of a "common enterprise." In the Seventh Circuit, that term requires horizontal commonality: *i.e.*, a pooling of investor funds and interests usually combined with a *pro-rata* distribution of profits. *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994); *Stenger*, 741 F.2d at 146 ("This Circuit has strictly adhered to a 'horizontal' test of common enterprise, under which multiple investors must pool their investments and receive pro rata profits."). Here, BXY investors' funds were pooled to fund the development and marketing of the "Beaxy Exchange"; as promoted, if the platform was successful, investors would share in that success equally in proportion to their respective BXY holdings through the appreciation of BXY. (ECF No. 1 ¶¶ 57-60, 62, 75.) These facts exemplify horizontal commonality. *See, e.g.*, *Schafer v. Graf*, No. 18 C 8236, 2021 WL 1784788, *3 (N.D. Ill. May 5, 2021) (horizontal commonality satisfied where investors' capital contributions were pooled and they expected to share profits on a *pro rata* basis); *Adams v. Cavanagh Communities Corp.*, 847 F. Supp. 1390, 1398 (N.D. Ill. 1994) (horizontal commonality satisfied where "investments rose and fell together and . . . shared a common risk").

In addition, BXY investors had a reasonable expectation of profits from Beaxy management's efforts. The Offering Materials referred to the purchase of BXY as an "investment" and provided profit projections, and both the Offering Materials and Whitepaper touted management's experience. (ECF No. 1 ¶¶ 63-65.) Defaulting Defendants pitched BXY as an investment intended to earn a profit. (*Id.* ¶ 66.) *See SEC v. Battoo*, 158 F. Supp. 3d 676, 687

6

(N.D. Ill. 2016) (promotor's marketing of transaction as investment is evidence that clients had expectation of profits). BXY purchasers were told they would play only a passive role, relying on the efforts of Beaxy Digital's management to develop the trading platform. (ECF No. 1 ¶¶ 55-67.) *See SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 367 (S.D.N.Y. 2020) (purchasers understood they would only profit if reputation, skill, and involvement of Telegram founders remained behind enterprise). For these reasons, BXY satisfies the *Howey* test.

### B. Defaulting Defendants Sold BXY in an Unregistered Offering.

Section 5(a) and (c) of the Securities Act prohibits the direct or indirect offer or sale of securities, through interstate commerce or the mails, unless a registration statement is in effect. *SEC v. Zenergy Int'l, Inc.*, 141 F. Supp. 3d 846, 852 (N.D. Ill. 2015). Any person who engages in steps necessary to distribute the unregistered offering is liable under Section 5. *Id.*

Here, Defaulting Defendants violated Section 5(a) and (c) of the Securities Act directly by selling BXY to investors in an unregistered offering in the United States. (ECF No. 1 ¶ 53.) The transactions were facilitated by interstate commerce because investors used blockchain to transfer bitcoin and ether to Beaxy Digital and sent fiat currency to Windy Blockchain's bank account. (*Id.* ¶¶ 32-34, 50, 80.) In addition, salespeople solicited potential investors through social media. (*Id.* ¶¶ 56, 72.) The sale of BXY tokens were not registered with the SEC, and the BXY offering did not satisfy any exemption from registration.[3] (*Id.* ¶¶ 1-2 4, 19.)

### C. Hamazaspyan Misappropriated Investor Funds for Personal Use.

Hamazaspyan is also liable for securities fraud. The elements of a claim under Sections 10(b) and 17(a) are essentially the same. "The principal difference is that § 10(b) and Rule 10b-5

---

[3] Once the SEC establishes a *prima facie* case, a defendant bears the burden of proving that the securities offering qualified for an exemption from registration. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126-27 (1953). No exemption applies here. (ECF No. 1 ¶¶ 70-72.)

7

apply to acts committed in connection with a purchase or sale of securities while § 17(a) applies to acts committed in connection with an offer or sale of securities." *SEC v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995). The Supreme Court has emphasized that there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and the same underlying conduct may establish a violation of more than one subsection. *Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019). To prove a violation, the SEC must show that defendants "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with *scienter*; (3) in connection with the purchase or sale of securities." *SEC v. Bauer*, 723 F.3d 758, 768-69 (7th Cir. 2013) (quotation marks and brackets omitted). The elements of claims under Section 17(a)(2) and (a)(3) are the same as those for Section 17(a)(1), except they require a showing of negligence instead of *scienter*. *Id*. at 768 n.2. *Scienter* is a mental state that "embraces an intent to deceive, manipulate, or defraud, as well as reckless disregard of the truth." *Bauer*, 723 F.3d at 775 (quotation marks and citations omitted). "An omission or misstatement is material if a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988).

Here, Hamazaspyan used a fraudulent device and engaged in a course of conduct designed to deceive investors because rather than using the BXY proceeds to fund the development of the Beaxy Platform, as promised, Hamazaspyan used $900,000 for personal use, including gambling. (ECF No. 1 ¶¶ 57, 60, 79-81.) *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (misappropriation of securities transaction proceeds to pay one's personal expenses operated as fraud or deceit under securities laws); *SEC v. Boock*, No. 09 Civ. 8261(DLC), 2011 WL 3792819, at *22-23 (S.D.N.Y. Aug. 25, 2011) (liability for misappropriation of assets).

Hamazaspyan acted with requisite *scienter* by willfully using investment proceeds for personal use. The requirement under Section 17(a) that the fraud occur in the offer or sale of a security and the requirement under Section 10(b) that the fraud be in connection with the purchase or sale of a security are satisfied because Hamazaspyan misappropriated proceeds of the investment offering, and because he withdrew some of the misappropriated funds while the offering was still ongoing. (ECF No. 1 ¶¶ 80-81.) *SEC v. Wilde*, No. 11-cv-0315, 2012 WL 6621747, at *5 (C.D. Cal. Dec. 17, 2012) ("fraudulent practice to misappropriate investors' money [was] in violation of Section 17(a)"), *aff'd*, *SEC v. Wilde*, 669 F. App'x 423 (9th Cir. 2016).

Hamazaspyan is also liable for making materially false statements and omissions. The Offering Materials that Hamazaspyan approved and provided to investors explained how investment proceeds would be used to fund the development of the Beaxy Platform.[4] (ECF No. 1 ¶¶ 57, 60, 79-81.) These statements were false and misleading because they did not disclose that Hamazaspyan could use the investment funds as his own personal piggy bank and to gamble. Further, these statements and omissions were material because a reasonable investor "would consider it important to know [his or her] funds were being misappropriated and used for purposes other than those stated when solicited." *SEC v. Lottonet Operating Corp.*, No. 17-cv-21033, 2017 WL 6949289, at *13-14 (S.D. Fla. Mar. 31, 2017). Hamazaspyan also acted with *scienter* by knowingly and intentionally approving the Offering Materials and then withdrawing $900,000 of investor proceeds for his personal use. (ECF No. 1 ¶¶ 79-81.)

II. **The SEC Is Entitled to the Relief It Seeks.**

The SEC respectfully requests this Court to order the following relief.

---

[4] Because Hamazaspyan had ultimate authority over Beaxy Digital's Offering Materials (ECF No. 1 ¶¶ 3, 57), he was the "maker" of the false statements for purposes of Section 10(b). *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 143-45 (2011).

9

### A. Defaulting Defendants Should Be Permanently Enjoined.

Securities Act Section 20(b) and Exchange Act Section 21(d) permit this Court to impose injunctive relief on Defaulting Defendants to prevent future violations of the securities laws, including conduct-based injunctions. *See* 15 U.S.C. §§ 77t(b); 78u(d). Once liability has been established, the SEC "need only show that there is a reasonable likelihood of future violations in order to obtain relief." *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982). In making this determination, courts focus on the totality of the circumstances, considering: (1) the gravity of the harm; (2) the extent of the defendant's participation and his degree of *scienter*; (3) the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; (4) the defendant's recognition of his own culpability; and (5) the sincerity of his assurances against future violations. *Id.*

Each of these factors supports imposing permanent injunctive relief against Defaulting Defendants, who caused significant harm to investors when they raised $8 million from the unregistered BXY offering. The unregistered offering took place over the course of more than one year. (ECF No. 1 ¶ 52.) Hamazaspysan also acted with a high degree of *scienter* by knowingly and intentionally misappropriating investor funds for his personal use and gambling. (*Id.* ¶¶ 79-81.) Defaulting Defendants also have failed to accept responsibility for their actions: they have not answered the Complaint and have failed to give the SEC or the Court any assurance that they will obey the securities laws going forward. While Beaxy Digital may no longer be operating, it may be reinstated at the discretion of Nevis officials. (McShane Decl. ¶ 6; Qualls Decl. ¶ 7.) Hamazaspyan could conduct another unregistered securities offering or commit securities fraud at any time in the future. Under these circumstances, the Court should enjoin Defaulting Defendants from these securities laws. *See SEC v. Benger*, No. 09-cv-676, 2015 WL 6859168, at *10-11 (N.D. Ill. Nov. 9, 2015) (imposing permanent injunctions on

defaulting defendants where serious investor harm, reasonable likelihood of future violations, and no acknowledgement of culpability or assurances of future violations).

Furthermore, the SEC asks that the Court permanently enjoin Defaulting Defendants from "participating, directly or indirectly, in any securities offering; provided, however, that such injunction shall not prevent Defendant Hamazaspyan from purchasing or selling securities other than BXY for his own personal account." This conduct-based injunction is narrowly tailored and warranted under the circumstances. *SEC v. Goulding*, 40 F.4th 558, 562-63 (7th Cir. 2022) (noting that "obey-the-law injunctions are not forbidden" and directing district court to "forbid[] with greater specificity what [the defendant] must not do").

**B.      Defaulting Defendants Should Pay Disgorgement and Prejudgment Interest.**

The SEC seeks the following disgorgement and prejudgment interest:

| Defendant | Disgorgement | Prejudgment Interest |
|---|---|---|
| **Beaxy Digital** | $5,939,931.80 | $1,397,816.70 |
| **Hamazaspyan** | $480,000 | $112,956.18 |

The SEC asks this Court to order Defaulting Defendants to disgorge their ill-gotten gains. The Court has ample discretion to determine whether to order disgorgement in an SEC enforcement action, and in what amount. *SEC v. Lipson*, 278 F.3d 656, 661-63 (7th Cir. 2002); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996). Indeed, disgorgement "need only be a reasonable approximation of profits causally connected to the violation." *SEC v. Slowinski*, No. 1:19-CV-03552, 2020 WL 7027639, at *3 (N.D. Ill. Nov. 29, 2020). In *Liu v. SEC*, 140 S. Ct. 1936, 1940 (2020), the Supreme Court determined that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." *See also* 15 U.S.C. § 78u(d)(7) (authorizing disgorgement). However, costs incurred to initiate an unregistered sale of securities, such as marketing and

consulting costs to further the sale, do not have any value "independent of fueling a fraudulent scheme" and should not be deducted. *Liu*, 140 S. Ct. at 1950; *see also SEC v. Crowd Machine, Inc.*, No. 4:22-CV-0076, 2023 WL 8438553, at *4 (N.D. Cal. Dec. 5, 2023) (refusing to deduct marketing and consulting expenses from disgorgement for unregistered ICO).

This Court may order disgorgement and prejudgment interest on a motion for default judgment without holding an evidentiary hearing when, as here, the existing record is sufficient to establish the amount to be disgorged. *See United States v. DiMucci*, 879 F.2d 1488, 1497 (7th Cir. 1989). Defaulting Defendants should also be ordered to pay prejudgment interest on the ordered amount of disgorgement. *Benger*, 2015 WL 6859168, at *8 ("[A] disgorgement order should include all gains flowing from the illegal conduct, including prejudgment interest."). The payment of prejudgment interest ensures that a defendant does not profit from illegal activity. *SEC v. Lipson*, 129 F. Supp. 2d 1148, 1159 (N.D. Ill. 2001).

In support of its request, the SEC has provided the Court with a declaration from SEC accountant Craig McShane, summarizing the voluminous financial records in this case. In arriving at the requested **$5,939,931.80** disgorgement against Beaxy Digital, the SEC deducted the unreimbursed $480,000 misappropriated by Hamazaspyan and $1,580,068.20 in business expenses from the total $8 million raised.[5] (McShane Decl. ¶¶ 8-10, 21, 24-26.) The deducted business expenses included costs to create and support the Beaxy Platform, such as software development, testing, and implementation, technical support and infrastructure setup, and market

---

[5] At his interview with SEC staff, Hamazaspyan stated that Beaxy Digital may have raised less than $8 million due to: (a) fluctuations in bitcoin and ether prices after Beaxy Digital received those assets in exchange for BXY; and (b) certain discounts provided to private sale investors. (McShane Decl. ¶ 28.) Hamazaspyan's unsupported and unsworn theories should not be credited because the stated dollar amounts in SAFT contracts incorporate any discount by issuing more BXY shares. (*Id*.) Further, Beaxy Digital should not benefit from crypto asset depreciation, if any, *after* the unregistered offering. *See Crowd Machine,* 2023 WL 8438553, at *4.

making services. (*Id.* ¶ 24.) The SEC did not deduct business expenses for public relations or marketing of the unregistered offering, or unclassified expenses that were not supported by any invoices or explanation. (*Id.* ¶ 25.) *See Crowd Machine, Inc.*, 2023 WL 8438553, at *4. The SEC also seeks **$480,000** in disgorgement against Hamazaspyan because he withdrew $900,000 in investor proceeds and only returned $420,000. (*Id.* ¶¶ 17-22, 29.) The SEC has calculated prejudgment interest on these disgorgement amounts, based on the standard IRS underpayment rate, from February 10, 2019 (the midpoint date of all known investor bank deposits) and October 15, 2023 (the date of defaults). For the recommended disgorgements, the prejudgment interest is **$1,397,816.70** for Beaxy Digital and **$112,956.18** for Hamazaspyan.[6] (*Id.* ¶¶ 27, 30.)

**C.    Defaulting Defendants Should Pay Substantial Civil Penalties.**

The SEC requests this Court to impose civil penalties against Defaulting Defendants pursuant to Securities Act Section 20(d) and Exchange Act Section 21(d)(3). 15 U.S.C. §§ 77t(d); 78u(d)(3). Civil penalties are intended to punish and deter wrongdoers, in recognition that "disgorgement does not actually result in any actual economic penalty or act as financial disincentive to engage in securities fraud." *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (internal quotation omitted). Accordingly, Securities Act Section 20(d) and Exchange Act Section 21(d)(3) provide for three tiers of maximum civil penalties.[7]

A one-time, first-tier penalty against Beaxy Digital in the amount of **$111,614** for the unregistered offer and sale of BXY tokens is appropriate and consistent with other cases involving the unregistered offering. *See, e.g., SEC v. Kahlon*, 873 F.3d 500, 503 (5th Cir. 2017)

---

[6] If the SEC collects the requested disgorgement, the SEC will petition the Court to establish a fund to distribute, if feasible, any collected funds to harmed investors.

[7] *See* "Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission" (as of January 15, 2023), https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.

(affirming $200,000 first-tier penalty for Securities Act Section 5 violations). A first-tier penalty is sufficient to deter and punish Beaxy Digital, which is no longer operating but could be reinstated in the future. (Qualls Decl. ¶ 7.)

As to Hamazaspyan, for the registration violation and fraud counts, the SEC seeks a third-tier civil penalty in the amount of **$960,000** (twice the amount of the $480,000 he misappropriated and has not paid back). A third-tier penalty is appropriate if: (1) the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and (2) the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons. *See SEC v. Zenergy*, No. 13-CV-5511, 2016 WL 5080423, at *5 (N.D. Ill. Sept. 20, 2016). The statutory maximum for "each such violation" is the greater of the statutory amounts or the "gross amount of pecuniary gain." *Id*. In determining the amount of the penalty, courts consider: (1) the seriousness of the violations; (2) the defendant's *scienter*; (3) the repeated nature of the violations; (4) whether the defendant has admitted wrongdoing; (5) the losses or risk of losses caused by the conduct; (6) any cooperation provided to enforcement authorities; and (7) ability to pay. *Id.* at *6.

A $960,000 civil penalty is appropriate for Hamazaspyan given the seriousness of his misappropriation as a director of Beaxy Digital, his high degree of *scienter*, the repeated nature of the violations (nine withdrawals of investor proceeds and violations of three statutes), and the risk of loss caused by his conduct. This penalty is also consistent with civil penalties against company directors based upon the amount misappropriated, among other factors. *See, e.g., SEC v. Kane*, No. 97 Civ. 2931, 2003 WL 1741293, at *5 (S.D.N.Y. Apr. 1, 2003) ($200,000 civil penalty where $595,000 misappropriated); *SEC v. PlexCorps*, No. 1:17-cv-07007, 2019 WL 13212569, at *1-2 (S.D.N.Y. Oct. 2, 2019) ($1,000,000 civil penalty where $4.5 million

disgorgement ordered). Furthermore, this recommended penalty is sufficient to punish and deter Hamazaspyan and others from misappropriating investor funds for personal use and from abusing the trust of investors as a company director.

### D. Hamazaspyan Should Be Barred from Serving as an Officer and Director.

Finally, this Court should bar Hamazaspyan from acting as an officer or director of any public company. Securities Act Section 20(e) and Exchange Act Section 21(d)(2) authorizes courts to impose such a bar on anyone who violated Section 17(a)(1) or Section 10(b), respectively, if the person's conduct demonstrates unfitness to serve as an officer or director. 15 U.S.C. §§ 77t(e), 78u(d). In determining whether a bar is appropriate, courts consider: (1) the egregiousness of the violation; (2) whether it was isolated or recurrent; (3) the degree of *scienter*; (4) the sincerity in assurances against continued infractions; (5) contrition; and (6) the likelihood of future violations. *Perres v. SEC*, 695 F. App'x 980, 981 (7th Cir. 2017).

As described above, during the private offering and for three months thereafter, Hamazaspyan misappropriated investor funds on nine occasions for personal use. He did so during and after the offering despite representations to investors, which he approved, that proceeds would be used to develop the Beaxy Platform. (ECF No. 1 ¶¶ 57, 60.) Although Hamazaspyan resigned from Beaxy Digital when his fraud was discovered, he has not paid back the entire stolen amount, has left the United States, and has not answered the Complaint. (*Id*. ¶¶ 20, 82.) He knowingly abandoned his fiduciary duties to Beaxy Digital and investors and acted with a high degree of *scienter* each of the nine times he chose to withdraw investor proceeds from the company's bank account and used the funds for personal use, including gambling. Hamazaspyan, now 35 years old, could have the opportunity to serve as an officer or director of a public company in the future, providing him with further opportunities to commit securities fraud. (Qualls Decl. ¶ 6.) Therefore, an officer and director bar is appropriate.

## CONCLUSION

For all these reasons, the SEC asks the Court to issue a default judgment as to Defendants Beaxy Digital and Hamazaspyan.

Dated: January 31, 2024                         Respectfully submitted,


By: */s/ Alyssa A. Qualls*
Alyssa A. Qualls (QuallsA@sec.gov)
Arsen R. Ablaev (AblaevA@sec.gov)
United States Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Phone: (312) 353-7390 | Fax: (312) 353-7398

*Attorneys for Plaintiff*
*United States Securities and Exchange Commission*

# CERTIFICATE OF SERVICE

       The undersigned, an attorney, hereby certifies that on January 31, 2024, a copy of the foregoing was served upon the following by email and International FedEx:

Beaxy Digital, Ltd.
c/o Spectrum Management and Consulting Ltd.
A.L. Evelyn Ltd Building
Suite 1, P.O. Box 258
Main Street, Charlestown
Nevis, West Indies
Tel: (869) 469-5501
Fax: (869) 469-5502

*Beaxy Digital, Ltd. and Registered Agent*


Defendant Artak Hamazaspyan
Artak.Hamazaspyan@gmail.com


Yankun Guo
Dinsmore & Shohl LLP
222 W. Adams Street, Suite 3400
Chicago, IL 60606
Yankun.guo@dinsmore.com
Tel: (312) 837-4328
Fax: (312) 372-6085

*Attorney for Defendants Windy, Murphy,*
*Abbott, Braverock Investments, Future Digital,*
*Windy Financial, Future Financial, and Peterson*

                                                                   */s/ Alyssa A. Qualls*
                                                                      Alyssa A. Qualls